# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 3:14-00100-1 |
| | ) | Judge Sharp |
| JOSE NAVARRETE BRAVO | ) | |

## MEMORANDUM

Pending before the Court is Defendant Jose Navarete Bravo's fully-briefed Motion to Suppress Evidence (Docket No. 100). The Court held a hearing on the Motion on March 20, 2015. For the reasons that follow, Defendant's Motion will be denied.

## I. Factual Findings[1]

On June 26, 2014, Trooper Brent McCawley of the Tennessee Highway Patrol ("THP")was patrolling Interstate 40 eastbound in Putnam County, Tennessee, when he came upon a Chevrolet Trailblazer bearing Texas license plates. The rear window of the Trailblazer was darkly tinted. Trooper McCawley pulled alongside the vehicle and observed that the side windows, too, were heavily tinted.

At approximately 12:31 p.m., Trooper McCawley initiated a traffic stop by activating his overhead lights.[2] The stop was for violation of Tennessee and Texas's window tinting laws, with the former prohibiting tinted side and rear window which allows less that 35% of light in, and the latter prohibiting tinting which lets less than 25% of light in.

---

[1] The following findings are drawn from the testimony of the two witnesses who testified at the suppression hearing, after considering their interests and demeanor. These facts are also drawn from the exhibits received in the evidence, including the recording of the traffic stop on the afternoon in question.

[2] The dashboard camera is activated when the lights are turned on, and backs up to record the 30 seconds prior to activation of the lights. The camera displays Eastern Standard Time.

1

The driver of the Trailblazer, Defendant herein, immediately pulled over. Trooper McCawley approached the front passenger side of the vehicle and told the occupants that the reason for the stop was that the windows were dark and "you're only allowed 25% in Texas." He then asked that the rear passenger window be rolled down some so that he could place a tint meter on the window. The meter indicated the window's tint was 1%, and Trooper McCawley told the occupants that was "the darkest [he'd] ever seen."

Trooper McCawley then asked the driver for a driver's license, but believing the driver did not understand him, spoke a few words in Spanish,[3] and then asked the occupants if anybody spoke English. William Daniel Navarrete, Defendant's son and a co-Defendant herein, indicated that he spoke English well. Trooper McCawley asked him to exit the vehicle, and observed that there were nine occupants of Hispanic decent in the vehicle.

Just a couple of minutes into the traffic stop, Trooper McCawley spoke with Defendant Navarrete, asking him where they were coming from and whether he lived in Tennessee. Defendant Navarrete indicated that they were looking for work and that he lived in Tennessee in a trailer "up the road," but he did not know the address. Defendant Navarrete did not have identification, but said he had a birth certificate. When asked where he was born, Defendant Navarrete said that he had been in "Houston for a little while,"[4] that he was an American citizen, and that he was working on getting an identification card.

Approximately four minutes into the traffic stop, Trooper McCawley told Defendant

---

[3] Trooper McCawley is not fluent in Spanish but claims to be conversant, having "studied" Spanish for fifteen years.

[4] After stating he had been in Houston, it appears that Defendant Navarrete told Trooper McCawley where he was born but a passing truck rendered the exchange inaudible.

Navarrete, "I know exactly what's going on here, okay?", meaning that Trooper McCawley believed that human smuggling was occurring. He told Defendant Navarrete to be honest, and Defendant Navarrete said, "You can trust me."

Trooper McCawley asked, "What's the deal with all the people in here?" Defendant Navarrete said they were headed to a construction job, pointed down the highway, and said up the road. Trooper McCawley then asked to see his hands and said, "You don't work construction." When asked whether they picked people up and dropped them off, Defendant Navarrete said, "We don't do that shit."

Defendant Navarrete indicated that the driver of the vehicle was his father. He stated that they picked the Trailblazer up in Houston, that it was owned by a friend, but that he also did not know the name of the owner.

At six minutes or so into the traffic stop, Trooper McCawley called Trooper Corey Stuart and asked him to come to the scene because he had one of "your cases, human smuggling." Trooper McCawley based that belief upon the fact that he had seen no construction equipment in the vehicle, Defendant Navarrete had been vague in his answer and had no identification card, the other occupants of the vehicle did not appear to speak English, the vehicle was going eastbound,[5] and he recently observed his partner handle two cases with similar facts.

Trooper McCawley then told Defendant Navarrete it looked like a human smuggling operation and Immigration and Customs Enforcement ("ICE") would be called to see if they wanted

---

[5] Trooper McCawley explained that the eastbound direction of the vehicle suggested that the driver was moving farther inland and away from Texas and its border.

to investigate.[6] If not, the driver of the vehicle would be warned or cited for the tinting violation, and the occupants of the vehicle would be on their way.

Trooper McCawley returned to the vehicle and spoke with the occupants briefly in Spanish, asking them their ages. He asked where their luggage was, and asked the driver for his wallet.

Ten minutes into the stop, Trooper Stuart arrived on the scene. Trooper McCawley told him that Defendant Navarrete seemed "cool," but Trooper Stuart said he would get "a little aggressive" with him to see if he "could clear this crap up." Trooper McCawley returned his attention to the occupants of the vehicle and asked Defendant Bravo, the driver, how much money he was carrying.[7]

Trooper McCawley returned to his vehicle with a driver's license that was given to him by Defendant Bravo. The license was from Texas and bore a Houston address.

Trooper Stuart told Trooper McCawley that he was going to read Defendant Navarrete his rights, to which Trooper McCawley stated, "He speaks good English." Trooper Stuart went to the Trailblazer and instructed Defendant Bravo to exit.

Defendant Bravo then followed Trooper Stuart back to where Defendant Navarrete was standing, and Trooper McCawley joined them shortly thereafter. Trooper McCawley then asked Defendant Navarrete the status of his father's citizenship and was told that he was born in Mexico, but was now a Untied States citizen and had "paperwork."

Defendant Navarrete was told that it was in his best interest to work with Trooper McCawley because it would help him (Defendant Navarrete) a lot, and they could help each other. Trooper

---

[6] Trooper McCawley explained at the evidentiary hearing that troopers sometimes defer to other agenies that have more expertise in a particular area.

[7] At the hearing, Trooper McCawley stated that he asked the question to see if, perhaps, Defendant had a large amount of money on him, which might suggest that he had been paid for transporting the occupants of the Trailblazer.

McCawley then told him that he knew the occupants of the Trailblazer were not United States citizens, they were here illegally, and "the gig was up." He reiterated it was best that Defendant Navarrete cooperate, otherwise all would be charged with human smuggling.

At 12:47 p.m., or approximately 16 minutes into the stop, Defendant Navarrete conceded that they were being paid to transport the individuals in the vehicle, claiming at first that they were paid $20 a head. When Trooper McCawley observed that would not even pay for gas from Texas, Defendant Navarrete stated that he "was not really sure," but it was around $480 to $500 apiece, and they would be paid on delivery. Defendant Navarrete also claimed that it was the first time he had been involved in transporting illegal immigrants, and denied any connection to a cartel or gang. He also denied that there were any drugs in the vehicle.

Trooper McCawley reiterated that "even if it is what it is," if ICE decided not to respond, the vehicle and its occupants would be free to leave. He told Defendant Navarrete that they would contact ICE to see what they wanted to do.

At approximately 12:52 p.m., Trooper McCawley was given permission to search the vehicle. The other individuals in the Trailblazer were told to exit, and Trooper McCawley opened the back hatch door, apparently to see if anybody was secreted in the hatch Upon questioning, the passenger indicated that they were from Guatemala and Honduras. Two were 17 years old.

At around the same time, Trooper Stuart read Defendant Navarrete his *Miranda* warning and he agreed to continue speaking. Defendant Navarrete told Trooper Stuart that the individuals were picked up from a stash house in Houston. He also claimed that he was not being paid for his efforts and was just along for the ride.

Shortly thereafter, Trooper Stuart called to see if ICE wanted to respond. Standard THP

5

procedure, which he followed, required Trooper Stuart to first contact THP's Criminal Investigation Division, and then the appropriate office of the Department of Homeland Security ("DHS"). Because of the location of the stop, there was some confusion as to whether DHS in Nashville or Knoxville, Tennessee[8] should be contacted.

Sometime shortly after 1:00 p.m., DHS Special Agent James Liles received a call in his Nashville office from THP regarding a traffic stop on Interstate 40. At approximately 1:13 p.m., Trooper McCawley was told that DHS agents from Nashville would be responding. It was estimated that the travel time would be at least 1½ hours.

In the interim, the troopers searched the Trailblazer. That search revealed no drugs or other illegal items. No luggage or construction equipment was found in the vehicle either.

The remainder of the stop was uneventful. After some time, it was decided that it would be best to move to a location off the highway. Defendant Bravo, driving the Trailblazer with the passengers aboard, followed Trooper McCawley to a Hardee's restaurant parking lot in Monterey, Tennessee. They arrived at approximately 2:45 p.m. DHS agents arrived around 3:10 p.m., approximately 2¾ hours after the initiation of the traffic stop.

Throughout the stop and its continuation in the parking lot, Defendant and his co-travelers were not handcuffed. There were not, however, free to leave.

A Criminal Complaint was filed against Defendants Bravo and Navarrete charging them with transportation of persons known to be illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(ii). That same charge was carried over into a two-count Indictment returned on July 2, 2014, along with

---

[8] Trooper McCawley testified at the hearing that either Chattanooga or Nashville, Tennessee would be called. However, because the stop was on Interstate 40 in the Cookeville/Crossville, Tennessee area, Trooper Stuart called to see if someone from DHS in Knoxville would be responding to the scene.

an additional count alleging that Defendants transported illegal aliens for "purpose of commercial advantage and private financial gain" in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii) & 1324(a)(1)(A)(v)(ii). (Docket No. 72 at 1).

## II. Analysis

Defendant Bravo moves to dismiss on two grounds. He argues that Trooper McCawley lacked "probable cause or reasonable suspicion to stop" the Trailblazer. (Docket No. 100 at 4). He also argues that the troopers "overstepped the bounds of a permissible traffic stop by extending it for hours to investigate the passengers' immigration status." (Id. at 5).

Just recently, in an opinion selected for publication, the Sixth Circuit in United States v. Winters, 2015 WL 1431269 (6th Cir. Mar. 31, 2015), set forth in detail the applicable law surrounding traffic stops. Instead of unnecessarily reinventing the wheel, the Court relies on that case for three settled propositions.

First, for purposes of the Fourth Amendment, the lawfulness of a traffic stop and its continuation is analyzed under a two-prong test:

> "[S]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth Amendment], even though the purpose of the stop is limited and the resulting detention quite brief." Delaware v. Prouse, 440 U.S. 648, 653 (1979). The question of whether a particular traffic stop passes constitutional muster is analyzed under "the standard for temporary detentions set forth in Terry v. Ohio, 392 U.S. 1 (1968), and its progeny." United States v. Everett, 601 F.3d 484, 488 (6th Cir. 2010). Under this framework, the stop must be 1) "justified at its inception"; and 2) "reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20. If an officer develops reasonable and articulable suspicion of criminal activity during a stop, "he may extend [the] traffic stop long enough to confirm or dispel his suspicions. Any such extension, though, must be 'limited in scope and duration.'" United States v. Johnson, 482 F. App'x 137, 143 (6th Cir. 2012) (quoting Florida v. Royer, 460 U.S. 491, 503 (1983)).

Id. at *4 (full citations provided).

7

Second, a lawful stop may not be extended any longer than necessary to confirm or allay suspicions that develop during the course of the initial encounter:

> "[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." Illinois v. Caballes, 543 U.S. 405, 407 (2005). Under the second step of the Terry framework, a traffic stop "must ... last no longer than is necessary to effectuate the purpose of the stop," and "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." Royer, 460 U.S. at 500. Once the original purpose of the traffic stop-here, . . . the occupants "cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot." United States v. Hill, 195 F.3d 258, 264 (6th Cir. 1999); see also United States v. Davis, 430 F.3d 345, 353 (6th Cir. 2005).

Id. at 5 (full citation provided).

Third, an objective standard is utilized to determine whether an officer has adequate cause to continue detention beyond the initial reason for the traffic stop:

> Whether an officer has reasonable, articulable suspicion of criminal activity "is based on the totality of the circumstances presented to the officer." United States v. Jones, 673 F.3d 497, 502 (6th Cir. 2012). This is an objective standard premised on "specific facts" that "would lead a reasonable officer to suspect illicit activity." United States v. Johnson, 482 F. App'x 137, 143 (6th Cir. 2012). Although the subjective beliefs of the officer are irrelevant, law-enforcement officials are "permitted to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." United States v. Shank, 543 F.3d 309, 315 (6th Cir. 2008) (internal quotation marks and citation omitted). Ill-defined hunches, however, are not sufficient to establish a reasonable suspicion.

Id. at 6 (full citation provided).

Application of the foregoing principles leads the Court to conclude that Defendant's Motion to Suppress must be denied.

As an initial matter, the traffic stop was lawful. Officers may stop a vehicle based on "the officers' familiarity with window tinting and their estimate that the vehicle was tinted substantially

8

darker than permitted by law[.]" Shank, 543 F.3d at 313; see also, United States v. Perkins, 209 F. App'x 502, 505-06 (6th Cir. 2006) (upholding traffic stop based upon belief that window were illegally tinted); State v. Davidson, 2013 WL 6188078, at *2-3 (Tenn. Crim. App. Nov. 26, 2013) (same). Here, Trooper McCawley stopped the Trailblazer because the windows appeared to be tinted to such a degree that they violated both Tennessee and Texas law, which his subsequent test confirmed. See Tenn. Code Ann. § 55-9-107(a)(1) (banning operation of motor vehicles with side and rear windows darkened to a degree which permits less than 35% of visible light to penetrate into passenger compartment)[9]; Tex. Transp. Code Ann. § 547.613(b)(2)(A) (requiring that tinting allow "a light transmission of 25% or more"). True, no ticket or citation was issued, but this does not affect the propriety of the stop. Shank, 542 F.3d at 313.

Defendant Bravo does not contend that the tinting on the Trailblazer was within the requirements of either the Tennessee or Texas code. Rather, he argues:

> Stated simply, it defies belief that, at 70 miles per hour in interstate driving, Officer McCawley could have visually distinguished a light transmission difference of 35 percent, 25 percent, or any other percent sufficient to justify his traffic stop. What he could and *did* distinguish was a vehicle with Texas plates being driven by a man of Hispanic heritage containing numerous passengers.

(Docket No. 100 at 5, emphasis in original).

Contrary to Defendant Bravo's contention, it was not necessary for Trooper McCawley to be able to distinguish between a 35% and 25% light transmission; rather, it was only incumbent upon him to believe that the Trailblazer's windows were darker than those allowed by Texas law. As both the videotape and the pictures introduced into evidence clearly show, the side and rear

---

[9] Although Tennessee's window tinting statute exempts a vehicle registered in another states, it does so only to the extent that the vehicle "meets the requirement of the state of registration." Tenn. Code. Ann. § 55-9-107(6)(A)(iii).

9

windows of the vehicle were extremely dark. In fact the windows allowed only 1% transmission. These facts, which are undisputed, destroy Defendant Bravo's assertion that he was stopped because he and the passengers were Hispanic. Simply put, Trooper McCawley, who viewed the Trailblazer from the back and side before activating his lights, simply could not see the occupants and certainly could not determine their ethnicity or race.

The lack of factual support aside, Defendant Bravo's assertion that he was selectively stopped because he was Hispanic fails as a matter of law. "A claimant alleging selective enforcement of facially neutral criminal laws must demonstrate that the challenged law enforcement practice 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" Abdul-Khaliq v. City of Newark, 275 F. App'x 517, 521 (6th Cir. 2008) (quoting Farm Labor Org. Comm. v. Ohio State Highway Patrol, 308 F.3d 523, 533-34 (6th Cir. 2002)).[10] "To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted." Id. "'Furthermore, there is a strong presumption that the state actors have properly discharged their official duties, and to overcome that presumption [defendant] must present clear evidence to the contrary; the standard is a demanding one.'" Daubemire v. City of Columbus, 507 F.3d 383, 390 (6th Cir. 2007) (quoting Stemler v. City of Florence, 126 F.3d 856, 873 (6th Cir. 1997)). Defendant Bravo's selective enforcement argument fails.

Turning to the duration of stop, Defendant Bravo observes that, within two minutes, Trooper

---

[10] The Court notes that "the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment" because "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." Whren v. United States, 517 U.S. 806, 813 (1996).

10

McCawley determined that the window were too darkly tinted, yet he chose not to write a ticket. At that point, Defendant argues, he should have been allowed to leave.

However, "'the Constitution does not mandate that a driver, after being lawfully detained, must be released and sent on his way without further questioning' once the detaining officer has concluded the original purpose of the stop." United States v. Canipe, 569 F.3d 597, 601 (6th Cir. 2009) (quoting United States v. Erwin, 155 F.3d 818, 820 (6th Cir. 1998)). In fact, "[t]he Supreme Court has stressed that '[a]n officer's inquiries into matters unrelated to the justification for the traffic stop ... do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.'" Winters, 2015 WL at *5 (quoting, Ariz. v. Johnson, 555 U.S. 323, 333 (2009). Further, questioning "a passenger in the car and not the driver[] does not alter the analysis." Id. And, while officers must be diligent in inquiring into unrelated topics, "'questions relating to travel plans,'" among other things, "'do not bespeak a lack of diligence.'" United States v. Stepp, 680 F.3d 651, 662 (6th Cir. 2012) (quoting, Everett, 601 F.3d at 494-95).

Here, immediately after the tint meter indicated a 1% reading, Trooper McCawley asked Defendant for his driver's license which, of course, would be necessary to issue a citation. He discovered that the driver apparently did not speak English, nor did the other eight occupants of the vehicle, save Defendant Navarrete. Accordingly, Trooper McCawley turned his attention to Defendant Navarrete.

Defendant Navarrete's responses to Trooper McCawley's initial questions raised suspicions. He claimed to live in a trailer "up the road," but could not give an address; claimed to have a birth certificate, but did not have an identification card; and, in response to the question of where he was

11

born, initially stated that he had been in Houston for a little while. None of this, of course, is indicative of criminal activity. Even though Trooper McCawley's statement four minutes into the stop that "I know exactly what is going on here" may have been a bit premature, it was not unreasonable for him to continue his questioning since an objective officer's curiosity at this point would undoubtedly have been piqued.

Subsequent questioning and investigation, all within the next couple of minutes, lent support to Trooper McCawley's impression that illegal trafficking might be afoot.[11] Defendant Navarrete claimed that they were traveling to a construction job, but Trooper McCawley did not believe that after looking at Defendant Navarrete's hand. Additionally, Defendant Navarrete gave no specifics about the job or location, other than to say it was down the road. Further, Defendant Navarrete stated that a friend owned the Trailblazer, that it was picked up in Houston, but that he did not know the owners name.

Within 16 minutes of the stop, Defendant Navarrete effectively confessed, saying that Defendant Bravo was being paid $480 to $500 dollars a head to transport the passengers. This confirmed Trooper McCawley early suspicion and, coupled with what the officers already learned in the first 15 minutes of the stop, provided probable cause to arrest Defendant Bravo and Defendant Navarrete for the illegal transportation of aliens. See, Md. v. Pringle, 540 U.S. 366, 371 (2003) (citation omitted) ("To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed

---

[11] In this regard, Defendant Bravo misplaces reliance on Gonzalez v. City of Peoria, 722 F.2d 468, 475 (9th Cir. 1983) for the proposition that "merely being in the United States without valid immigration status . . . is not *criminal* activity . . . but rather is a civil matter." (Docket No. 100 at 6, emphasis in original). Even is Defendant Bravo were correct (but see, 8 U.S.C. § 1325 making it illegal for an alien to enter the country at a time or place other than that designated by an immigration officer) it is unquestionably unlawful to transport illegal aliens under various provisions of 8 U.S.C. § 1324(a)(1).

from the standpoint of an objectively reasonable . . . officer, amount to' probable cause"); United States v. Pearce, 531 F.3d 374, 380 (6th Cir. 2008) ("Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that an offense has been committed").

In the abstract, the overall length of the detention – from the time of the traffic stop until DHS agents took custody some 2¾ hours later – seems excessive. However this length of time is not presumptively unconstitutional. See, United States v. Comegys, 504 F. App'x 137, 142 (3rd Cir. 2012) (stop lasting more than three hours was not presumptively unreasonable where, within minutes of stop, defendant provided an improbable travel itinerary, subsequent search of vehicle pursuant to consent revealed incriminating evidence, and part of time was spent waiting for K-9 to arrive on scene); United States v. Maltais, 403 F.3d 550, 556-57 (8th Cir. 2005) (three hour delay between stop and arrest not unlawful even though defendant spent majority of time in back of patrol car where delay was caused by the remote location and fact that K-9 was far away). Moreover, sixteen minutes into the stop, Trooper McCawley had probable cause to arrest Defendants for trafficking and, therefore, the delay thereafter occasioned by the wait for DHS agents to arrive did not violate the Fourth Amendment. See, United States v. Chavez, 660 F.3d 1215, 1224 (10th Cir. 2011) (stating that extending traffic stop to await arrival of canine unit did not violate the Fourth Amendment where officer had probable cause to arrest defendant); United States v. Vinton, 594 F.3d 14, 24 (D.C. Cir. 2010) (defendant's rights not violated where, within minutes of traffic stop officer found knife and had probable cause to arrest him, even though investigator did not arrive for another 45 minutes); United States v. Sturgis, 238 F.3d 956, 959 (8th Cir. 2001) ("Because the agents could have arrested [the defendant], they didn't violate the Constitution by detaining [the defendant] for

two hours while awaiting the arrival of the canine unit.").

"'The ultimate touchstone of the Fourth Amendment . . . is reasonableness.'" Mich. v. Fisher, 558 U.S. 45, 47 (1996). In the context of the prolongation of a traffic stop, "[t]he key . . . inquiry is 'whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly.'" United States v. Cochrane, 702 F.3d 334, 340-341 (6th Cir. 2012) (quoting Everett, 601 F.3d at 494). Based upon the totality of the circumstance and viewed from an objective perspective, the Court finds that Trooper McCawley acted diligently in this case.

### III. Conclusion

On the basis of the foregoing, Defendant Bravo's Motion to Suppress will be denied. An appropriate Order will be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE